UNITED STATES U.S. DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X:

MICHELLE A. SCHENCK,

Plaintiff,

-against-

UNITED AIRLINES,

Defendant.

-------------------------------------------------------

Civil Action No. 1:21-cv-00659-LJV

Hon. Lawrence J. Vilardo

## MEMORANDUM IN LAW IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF 'S AMENDED COMPLAINT

Michelle Schenck, (Pro Se)

# TABLE OF CONTENTS

Plaintiff's Claims Should Be Affirmed for Stating Plausible Claims                4

Subject Matter Jurisdiction, Personal and Specific                               4

Venue                                                                            5

United Airlines, Inc. filed as a Foreign Business Corporation with NY            5

Process of Service                                                               6

ARGUMENT

    II.  Motion to Dismiss Standard                                              8

    II.  Introduction                                                           14

    III. Discriminatory Acts alleged by Ms. Schenck prior to December 16, 2019  18

    Direct Evidence of Discriminatory Intent                                   19

    United's Charter Program History Before August 9, 2010.                    19

    After August 9, 2010.                                                      20

    Final and Binding -2005-2010 Agreement                                     23


    Kim Guillory and Sharon Tesler v United Airlines 20-CIV-03889 (Superior Court of The State of California for the County of San Mateo to USDCND California Oakland. 20 cv 07199.    28

    Charter Program                                                            28

    THE LONG HISTORY OF DISCRIMINATION AT UNITED                               30

    IV. The Applicable Legal Standards Under the Railway Labor Act             32

    V. With this Court's permission Ms. Schenck would file a second amended complaint

        for Enforcement of the August 2010 MEC 3-08 System Board Decision     37

VI  Due Process                                                                          37

VII. Prior Courts holds Arbitration Agreement Requiring Employee to Pay Half of

    Arbitration Costs is Unconscionable.                                      38

VIII.  Take It or Leave It.                                                               40

IX.  Conclusion                                                                          40

### TABLE OF AUTHORITIES

1. *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010)                                       5

2. *Milliken v. Meyer*, 311 U.S, 457, 463 (1940)                                         6

3. *Zipes v. Trans World Airlines*, Inc. 455 U.S. 385 (1982)                             7

4. *Conley v. Gibson*, 335 U.S. 41 (1957)                                                7

5. *Bell Atlantic Corp v. Twombly*, 550 U.S. 540 (2007)                                  7

6. *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, (SDNY. 2003). 8

7. *Dennis v. Pan American World Airways,* 746 F. Supp. 288 (E.D.N.Y. 1990)  14

8. *As h v. Tyson Foods, Inc*, 546 U.S. 454(2006)                              Passim

9. *Campbell v. Pan American World Airways,* 668 F. Supp. 139 (E.D.N.Y. 1987)  14

10.  *Independent Union of Flight Attendants v. Pan American World Airways,* 789 F.
    2d 139 (2d Cir. 1986)                                                           14

11.Kim Guillory and Sharon Tesler, v. United Airlines, 20-CIV-03889 Superior Ct
    California for the County of San Mateo to USDCND California Oakland.   27

12.Elmore v. Chi. & Ill. Midland Ry. Co., 782 F.2d 94, 95-96 (7th Cir. 1986)  32

13.*Miller v. United Airlines, Inc.*, 174 Cal. App. 3d 881 (1985)                        33

14.Gunther v. San Diego & A. E. R. Co. (1965) 382 U.S. 257                        34

15.*English v. Burlington Northern Railroad Company*, 18 F.3d 741 (9th Cir, 1994) 35

16.*Virginia Railway Co.v System Fed'n No 40*, 84 F.2d 641 (4th Cir 1936)      34

17.*IAM v Street*, 367 U.S. 740 (1961).                                                   35

18. *Hill v Norfolk and Western Railway*, 814 F.2d 1192 (7th Cir. 1987).          35

19. *International Ass'n of Machinists v. Central Airlines*, 372 U.S. 682 (1963)   36

20. *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711. 1944

21. *Chavarria v. Ralphs Grocery Co.*, 2013 WL 5779332 (9th Cir. 2013)          37

22. *Hudson v. P.I.P. Inc.*, Case No. 19-11004 11th cir                        37

23. 45 U.S.C. § 151 *et seq.*, The Railway Labor Act ("RLA")                  passim

24. 29 CFR §§ 1201-1205, § 1205 Air Carriers NOTICE                               17

25. 28 U.S.C. § 1337                                                               4

26. 28 U.S.C. § 1332(c)                                                            6

27. Fed. R. Civ. P 8(d)(1)                                                         6

28. Fed. R. Civ. P 12,  12 b 6. and 12 e.                                     passim

29. corporationwiki.com                                                           6

Plaintiff Michelle Schenck ("Plaintiff" or "Ms. Schenck" ), submits the following Memorandum in Opposition to United's ("United") Motion to Dismiss; the Amended Complaint ("Complaint").   For the reasons set forth below, Ms. Schenck requests that this court deny the Motion to Dismiss in its entirety.

Plaintiff's claims should be affirmed in this federal court because the Court has Subject Matter Jurisdiction under diversity of the Plaintiff and Defendant, the United States Code, and Commerce, the Railway Labor Act and the Code of Federal Regulations, and under the Equal Employment Opportunity Commission ("EEOC"); acts of Congress. Ms. Schenck's suit is arising under a law regulating commerce of which the District Court has jurisdiction under 28 U.S.C. § 1337, irrespective of the amount involved.

The venue is also proper in a federal court in the Western District of New York because Plaintiff lives in Buffalo, New York. Plaintiff's claims are not time barred because the very fact the Plaintiff must come into federal court to have her claims enforced under the Railway Labor Act is disparate treatment by United according to due process and settled law. United Airlines is subject to Jurisdiction in this Court, Personal and Specific and the Venue is proper.

Defendant's claim United Airlines does not reside in the Western District of New York and that none of the "Alleged Acts or Omissions Giving Rise to this Litigation Occurred in New York" is a red-herring argument.

United Airlines, Inc. filed as a Foreign Business Corporation in the State of New York on Friday, October 31, 1980 and is approximately forty-two years old, according to public records filed with Department of State. A corporate filing is called a foreign filing when an existing corporate entity files in a state other than the state they originally filed in. (See corporationwiki.com/p/2nrqws/united-airlines-inc.)

Pursuant to 28 U.S.C. § 1332(c), "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." United is now, and ever since this action commenced has been, incorporated under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois under the "nerve center" test. *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010).

As an Officer Court the attorney is speaking on behalf of her client United, an airline and stating what she thinks is best for her client.  What is true is that after the attorney has been advised that statements she made were false, she has to go back to this Court to correct them.

## **PROCESS OF SERVICE**

There is also a question being raised by the Defendant about the Process of Service in the Plaintiff's Complaint.  The Supreme Court of the United States in *Milliken v. Meyer*, 311 U.S, 457, 463 (1940) held that the constitutional adequacy of an alternate method of service "is dependent on whether or not the form of substituted service provided for such cases and employed is reasonably calculated to give (the defendant) actual notice of the proceedings and an opportunity to be heard."   The Plaintiff has given the Defendants a reasonable notice under the circumstances and the Defendant has not noticed any issues in responding in less than a timely manner.  Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Although there is no "technical form" required, the plaintiffs allegations

"must be simple concise, and direct." Fed. R. Civ. P 8(d)(1). The purpose of these rules is "to give the defendant fair notice of what the claim is and the grounds upon which it rests." The Plaintiff has complained of disparate treatment, age discrimination and unconscious bias.

Defendant United like a previous Defendant TransWorld Airlines has implied to this Court that the Plaintiff has not filed timely charges. "Subsequently, on October 15, 1976, the District Court denied TWA's motion to exclude class members who had not filed timely charges with the *EEOC*. In support of its motion, TWA argued that instead of an affirmative defense analogous to a statute of limitations, timely filing with the *EEOC* is a jurisdictional prerequisite not subject to waiver by any action of the defendants. While the District Court agreed that the filing requirements of Title VII are jurisdictional, it denied the motion on the basis that any violation by the *airline* continued against all the class members until the *airline* changed the challenged policy. Id., at 131a-132a.  See *Zipes v. Trans World Airlines*, Inc. 455 U.S. 385 (1982) The Supreme Court has held that the 180-day period for filing charges with the *EEOC* is subject to equitable doctrines including tolling. *Zipes*, at 393.  .

## ARGUMENT

### I. MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) should be granted *only* if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 335 U.S. 41, 48 (1957) (emphasis added); *see*

*also* Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp v. Twombly*, 550 U.S. 540, 570 (2007). A motion under Rule 12(b)(6) merely tests the legal sufficiency of a complaint, requiring a court to construe the complaint liberally, assume all facts as true, and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 556-57. A complaint should never be dismissed because the court is doubtful that the plaintiff will be able to prove all of the factual allegations contained therein. *Id* The Plaintiff need only set forth the particular facts of race and age discrimination, which at this stage must be accepted as true, to survive a motion for dismissal the Complaint. Moreover, United repeatedly states throughout their Memorandum in Law in Support of their Motion to Dismiss that the Complaint is vague and lacking in detail. To begin, this is *no* ground for dismissal under Rule 12(b)(6). *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 333 (S.D.N.Y. 2003). If United truly believed that the clarity of pleadings were deficient, they should have moved to for a more definite statement under Rule 12(e) and requested that Plaintiff set forth more detail. Tellingly, United did not; the Complaint is sufficiently clear and detailed, a charge was filed with attachments and an affidavit was signed and United's arguments to the contrary must be disregarded.

In the EEOC attachments:

May 21, 2021   Complaint: I have exhausted my administrative remedies and received my"right to sue" on February 26th, 2021. I am filing this charge in complaint about unlawful discrimination, harassment, bully, hostile work environment I experienced as a result of myrace/White and my age (DOB 07/05/1955).

All actions of all defendants were taken by United employees and supervisors and managers.

I believe United violated The Age Discrimination in Employment Act and Title VII of the CivilRights Act of 1964 and compelled, coerced, collusion, aided and abetted discrimination.

On March 3rd, 1998 I began working as a flight attendant for Legacy United Airlines. Throughout my 22 years of employment I performed my duties competently and successfully. Iwas hard working, dedicated and loyal. I received numerous commendations and positive reviews from CEO's, managers, peers and passengers throughout my years of service.

I have earned work-related privileges that were extremely resented with criticism which United intended to get rid of its senior flight attendants. United welcomed any criticism of its oldest employees in order to justify the eventual termination of senior employment. United is terminating older employees at an unprecedented rate. United targeted me with malicious andfalse discriminatory allegations based on my age and race/White

December 16, 2019 to December 18, 2019 EWR-LHR-EWR

_____

(3 day trip).12/16/2019 Place: **Newark** Airport (EWR-LHR). 12/17/2019: Place: London layover (Mall)off duty. 12/18/2019 Place: London Heathrow International Airport/Aircraft.(LHR-EWR)

8 crew Attendants. Crystal Baxter ( African American) Purser/Lead, Tony Williams (African American), Mechele Starkes ( African American), Sharon Brown (African American), May Cheng (Asian), Blie Bueno (Bi-African American), Blandin Clark (African American}, Michelle Schenck (Caucasian).

Day 2: 12/17/2019- Mall off duty(Layover): Mr. Clark asked to join me for shopping and dinner.

Mr. Clark, relatively a new hire, completed United's six month probation period. In lighthearted conversation at dinner he mentioned the lack of teamwork and mistreatment the crew displayedtowards me and I concurred his same mistreatment jokingly replied; "Oh, no worries, those bitches" we both laughed. Mr. Clark remarked people do not consider him black African American due to his light colored skin. I referred to a boy, being younger in age "Oh boy no you don't look black". We continued to shop. I did not recall Mr. Clark verbally offended nor correct my statement.

Day 3: 12/18/2019- Airport elevator/ Aircraft Flt#15 (LHR-EWR}:

I, along with seven employees entered the London Heathrow Airport elevator. I made a comment about the great time with Mr. Clark, remarking; •1 had such a nice time with Blandin yesterday, that boy even

helped me hold my bags while I put my coat on, what a gentleman!" Ms. Baxter's (third party) upset at my remark advised me of her previous position at United; "Iwas a Houston In-Flight Supervisor and here is a word of advice calling a black man a boy would not go well down there" (Texas}.  I am living in upstate New York. I was confused by her statement.

I offered to apologize to Mr. Clark but was denied due to time constraints for an on-time departure. I remarked to Ms. Williams my unawareness and confusion of the misunderstood semantics of the word"

I  will have to  be more  vigilant moving forward especially of the way the world is today with everything being Politically Correct, Black Lives Matter and LGBTQ etc".

**Ms. Williams, Ms. Bueno and Ms. Starkes "chanted "Black Lives Matter and profound language (bitch) at me.  (Emphasis Added)**

Two families requested infant bassinets. I referred to "Jewish family" to differentiate. This is a term widely used by flight attendants and Customer Service Representatives in the industry, most often Tel Aviv flights.

I felt reverse discrimination against and bullied cornered in the aircraft "Aft galley.  I was called a "bitch" by a "black" employee while she was "on duty". I also reasonably believe that the attackstemmed from resentment of my privileges that accompanied my age and seniority. All 6 African American and 1 Asian employees submitted reports of falsehoods consistent verbatim targeting me because I am race/VVhite .  Most disturbing  Ms. Williams  reported;  "I have worked with Michelle many times before and she does often refer to people based on race, ethnicity or religion". I have worked with Ms. Williams a couple of times at "Legacy" United before it mergedwith Continental Airlines (2010). Tony has known racial bias regarding caucasian employees.
I believe Employee Ms. Williams targeted me because I am race/VVhite . All seven minority employee  colluded reports  contain  numerous  falsehoods  and inaccuracies  riddled with  slander damaging  my character.

12/23/2019:  Ms. Baxter filed a complaint to United employees Mackey, Michelle, Cintron,Danny; Ethics And Compliance Office riffed with false defamatory inaccurate statements.
I believe Ms. Baxter; purser/lead flight attendant targeted me because I am white took the word"boy" out of context, misunderstood, blown out of proportion, and initiated a company investigation. (Dkt.1, P 7-9)

On January 10, 2020, the Plaintiff received a document from United titled Letter of Investigation for Performance.  She was told the letter was being issued in accordance with the provisions of Section 23.A.2 if the Flight Attendant Agreement and that a meeting will be conducted on January 15, 2020.

The purpose of the meeting will be to investigate a complaint.  "The complaint states that you made derogatory remarks about flight attendant Blandin Clark such as "I made the black boy carry my shit."  The complaint also states that you referred to the female flight attendants as "Bitches" while operating pairing E5036 on December 16, 2019 EWR-LHR-EWR." (Facts Not in Evidence.)

1/15/2020: "Investigation Meeting" 2:00pm.Insufficient documentation. Mr. Navin Singh (Union Representative) informed me United is pre-determining termination fearful 'they do not want a "Starbuck" incident".

United failed transparency not providing all flight attendants reports and pertinent information prior to Investigation meeting.

1/27/2020: Terminated. "Decision Meeting" issued by Ms. Gloria Reid, African American; Supervisor Inflight Services, Reason "Derogatory Remarks". Present; Mr. Julian Salazar; Hispanic; Supervisor-Base In- Flight ManagementInflight. AFA Union; Navin Singh GrievanceRep. and Kim Montgomery AFA Newark Domicile President.

1/27/2020: Grievance filed; Association of Flight Attendant AFA-MEC union.

2/1/2020: Employee Separation Letter reason; "Released-Unsatisfactory Performance".

3/5/2020: NJUI Appeal: New Jersey Department of Labor Appeal Tribunal determination reversed company decision found no intention of violation of United Airlines policy. It was determined under oath I did not intend to be deliberate, offensive nor malicious.

5/12/2020: EEOC filed (Enclosed report). Mediation request denied.
United Airlines Position Statement to EEOC. United does not have the correct facts. United'sstatements contain numerous falsehoods and are inaccurate. I did not intentionally violate United's Working Together Guidelines.

12/18/2020: Appeal 1 Meeting, Manager, Izzy Ortiz (Hispanic),Supervisor, Julian Salazar( Hispanic} and Josie Lira{}. Union Reps; Navin Singh & Peggy Kazlaukas; Association of FlightAttendants AFA-MEC via/ Zoom.

**2/26/2021;** Appeal 1 Decision; Izzy Ortiz Newark Supervisor-Termination no reversal. (Supra 9)

      The Association of Flight Attendants filed an appeal to the United Airlines System Board, but it was withdrawn in error by the Plaintiff, after the Union decided not to go forward with her grievance and told her she could only go forward on her own at her expense and when she requested United refused reinstatement. (Facts Not in Evidence)

2/26/2021: EEOC "Right to Sue" letter received. (Enclosed report).

I believe United pre-determined my termination prior to the Investigation Meeting indicating "United does not want a Starbucks" incident.  United ignoring my concern of a personal family matter at the Investigation Meeting. I, confused and emotionally distressed by retaliatory questions and the thought of losing my job over a misunderstanding. I am indignant and amazed that my character was judged without knowing me. I am annoyed and appalled I wasintimidated not because I was called a bitch but for having a different opinion. I never want tooffend or hurt anyone. I meant to compliment Mr. Clark's chivalrous kindness of someone younger in age than myself.

United maintains that it will not compromise the safety of its airline, that it believes in the "open sharing of collective attitude of safe thinking to create a safe culture". Ms. Baxter compromised the safety of Flight #15. United's policy emphasizes an important role that flightattendants play in this culture. "Each flight attendant is responsible for performing job duties safely and is instructed to protect you and your fellow co-workers" as per United's Working Together Guidelines.

I was terminated because I am race/White. I was targeted because of being Caucasian falsely accused  of insensitivity  racially  driven by seven minority  employees  for misunderstood semantics for the word "boy"

I was terminated because of my age. United engages in a pattern of intentionally discriminating and retaliating against older long-time employees and replacing them with younger aged employees communicating with the word "boy".

United  failed  to prevent  discrimination and systemic harassment  of management  supervisors Ms. Gloria Reid; African American And Mr. Julius Salazar; Hispanic. I believe I was discriminated against and unlawfully terminated by Ms. Reid because I was the race/White of six African American employees and 1 Asian employee. The termination "Decision Meeting" I responded "I am not a racist person" falsely accused and silenced.

I believe after years of great performance. I am being nitpicked for things that United didn't care about before and a word everyone uses in the workplace; boy. Referring to a friend someone younger in age than myself has been taken out of context misunderstood and said with no racialintent. I have been called a girl numerous times in all 20+years working at United.

If you cannot be specific and say that you acknowledge that someone who is significantly younger than you took offense at being referred to as a "boy", a word you use to describe those much younger and never at a position such that when his probationary period at United seemed to demand he be insulted on behalf of the black co-worker. Called a bitch. Behavior he told me he found it offensive until suddenly found himself referred to as a boy by a coworker. I have been called a "girl" for 22 years and had no idea that the male version of the term denoting young male was much more offensive to men? That my being referred to as "girl" is not meant as derisive should not be questioned in light of my being terminated for referring to a young male as "boy".

I am outraged that it is not acceptable to refer to a young co-worker as "boy" but acceptable to refer to a seasoned coworker as "girl" at age 65.

I feel I was targeted and fired as opposed to a lesser punishment because of my age and status as a senior flight attendant. United terminated me and selected such a harsh penalty despite my 20+ years of above and beyond exemplary customer service and spotless work record and overall performance because I am an older employee who is more expensive to employ than younger new hires. United didn't choose a lighter penalty of suspension or counsel due to my age that would have contemplated me remaining employed, because of and as a direct result of my age.

As a consequence of United's unlawful termination I have suffered and continue to suffer, considerable lost wages and benefits (401k with match, travel and Life Insurance), harm to my professional reputation, career derailment, emotional physical distress, anxiety and mental anguish, sleeplessness, loss of enjoyment of life, strained relationship with my family and friends, suffering psychologically impacted by and changed my life.

In addition, the loss of my seniority and with employment records that include termination "Unsatisfactory Performance", however unjustified, I will have extreme difficulty finding a comparable position any time in the foreseeable future.

I allege claims of reverse race discrimination under The Age Discrimination in Employment Act and age discrimination under Titlel VII of the Civil Rights Act of 1964. Wrongful termination of employment, Hostile Work Environment, Retaliation bullying, Intentional infliction of emotional distress, Defamation and slander of all employees, Negligent Supervision against management defendants. Breach of express oral contract. Not to terminate employment without good cause against United and management.

My available remedies include reinstatement with my seniority pay, back pay, contract conditions, damages and any occurred fees. ( Supra, 10,11)

See Ash v. Tyson Foods, Inc, 546 U.S. 454, 456 (2006) (whether calling someone

"*boy*" is a reflection of *racial animus* turns on "various factors, including context, inflection,

tone of voice, local custom, and historical usage"). The Court does not mean to downplay the offensiveness of Boundy's remarks, but they are not severe or pervasive enough, standing alone, to create a hostile working environment.

These allegations establish the essential elements in the Complaint. Because the Plaintiff has met the pleading requirements, United's Motion to Dismiss must be denied.

## II. **INTRODUCTION**

Ms. Schenck alleges in her Complaint and her Amended Complaint:

1.       That Ms. Schenck was employed as flight attendant employee who worked for an airline, United Airlines from 1998 to January 2020 when United discharged her for the pretextual reason of an "Inappropriate Remark as stated in the Letter of investigation or "Poor Performance" as stated in the Termination Letter or the reason stated in United's Position Statement to EEOC Reason: "Inappropriate Racial Language." On the Intake form provided by the EEOC, Ms. Schenck checked off the boxes of Race and Age. In her affidavit submitted the same day, plaintiff set forth the specific nature of her complaint. While the Court must accept as true the complaint's well pleaded factual allegations and draw all reasonable inferences in favor of the non-movant, the Court is not required to accept the assertions in the non-moving party's pleading that constitute conclusions of law. *Ashcroft*, 556 U.S. at 678 (Dkt 20-3, P.5.) "United for the purposes of this Motion to Dismiss

only, Defendant accepts all facts pled in the Amended Complaint as true." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  (Supra, P,3, Fn1.)

2.      In 1990, in *Dennis v. Pan Am*, First, they claim these claims have been preempted by the Railway Labor Act…  "In connection with their motion to dismiss, the defendants have also requested that sanctions be imposed on the plaintiff's attorney pursuant to Fed.R.Civ.P. 11. *Dennis v. Pan American World Airways,* 746 F. Supp. 288 (E.D.N.Y. 1990)

3.      The law is well-settled that state law torts arising from employment-related disputes in the airline industry have been preempted by the Railway Labor Act ("RLA") adjustment board procedures ( 45 U.S.C. § 151 *et seq.*), and a reasonable pre-filing inquiry into this matter by plaintiff's attorney would have revealed the law in this area. *See Campbell v. Pan American World Airways,* 668 F. Supp. 139 (E.D.N.Y. 1987); *Independent Union of Flight Attendants v. Pan American World Airways,* 789 F.2d 139, 141 (2d Cir. 1986). Fn 1.

Fn 1. Other circuits have also recognized that this type of state law tort claim is preempted by the RLA adjustment board procedures. *See Edelman v. Western Airlines,* 892 (9th Cir. 1989); *Fisher v. Hertrich,* 680 F. Supp. 1250, 1252 (N.D.Ill. 1988); *Gregory v. Burlington Northern R.R. Co.,* 638 F. Supp. 538 (D.Minn. 1986), *aff'd,* 822 F.2d 1092 (8th Cir. 1987). *Dennis, Supra*, at 292.

4.      The Plaintiff is a defined employee, in a craft or class, under the Railway Labor Act.  45 U.S.C. § 151 Fifth. 45 U.S.C. § 181.   United is an air carrier defined according

to Congress by the Interstate Commerce Commission and the National Mediation Board. 45 U.S.C. 151 First. 45 U.S.C. 181-185.

5.      The Plaintiff and the air carrier, United, has a responsibility and duty to settle disputes.

"It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152.  45 U.S.C. § 182.

6.      Eighth. Notices of manner of settlement of disputes; posting

**Every carrier shall notify its employees by printed notices** in such form and posted at such times and places as shall be specified by the Mediation Board **that all disputes between the carrier and its employees will be handled in accordance with the requirements of this chapter,** and in such notices there shall be printed verbatim, in large type, the third, fourth, and fifth paragraphs of this section. **The provisions of said paragraphs are made a part of the contract of employment between the carrier and each employee, and shall be held binding upon the parties, regardless of any other express or implied agreements between them**. (Emphasis Added) 45 U.S.C. § 151 Eighth.

7.    United CEO Scott Kirby accepts his fiduciary duty with the Board, under the law.

8.    Notice to Employees is an 11 x 17, Form 7 approved by the NMB on October 21, 1975.  (29 CFR 1205 Air carriers Labor management relations Railroads)

9.    Seventh. Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden

**No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.**  (Emphasis Added) 45 U.S.C. § 151 Seventh.

10.    § 153 (m) The awards of the several divisions of the Adjustment Board shall be stated in writing. A copy of the awards shall be furnished to the respective parties to the controversy, and the awards shall be final and binding upon both parties to the dispute. In case a dispute arises involving an interpretation of the award, the division of the board upon request of either party shall interpret the award in the light of the dispute.  45 U.S.C. § 153 m, and 45 U.S.C. § 184.

11.    § 153 First. Establishment; composition; powers and duties; divisions; hearings and awards; judicial review

There is established a Board, to be known as the "National Railroad Adjustment Board",

the members of which shall be selected within thirty days after June 21, 1934, and it is

provided—

(p) If a carrier does not comply with an order of a division of the Adjustment Board

within the time limit in such order, the petitioner, or any person for whose benefit such order

was made, may file in the District Court of the United States for the district in which he

resides or in which is located the principal operating office of the carrier, or through which

the carrier operates, a petition setting forth briefly the causes for which he claims relief, and

the order of the division of the Adjustment Board in the premises. Such suit in the District

Court of the United States shall proceed in all respects as other civil suits, except that on the

trial of such suit the findings and order of the division of the Adjustment Board shall be

conclusive on the parties, and "**except that the petitioner shall not be liable for costs in**

**the district court nor for costs at any subsequent stage of the proceedings, unless they**

**accrue upon his appeal, and such costs shall be paid out of the appropriation for the**

**expenses of the courts of the United States** (Emphasis Added) 45 U.S.C. § 153 p, 45

U.S.C. § 184.

### III. <u>DISCRIMINATORY  ACTS ALLEGED  PRIOR to December 16, 2019</u>

The discriminatory acts alleged by Ms. Schenck prior to December 16, 2019 and

United showing the details Ms. Schenck had at the time in what appears to be age

discrimination in specific detail with the facts as she knew then in July 2015, and twice in July 2019 in United's Charter Program. (Supra, P. 3, 4.)  United has gone on to explain this court that even if Plaintiff exhausted her administrative remedies regarding any allegations prior to December 16, 2019 – which she has not - any allegations that occurred more than 300 days prior to the filing of her EEOC Charge cannot be the basis of her claims in the present action.  Based on the foregoing, the only allegations that may form the basis of Plaintiff's claims in the present action are those that allegedly occurred on or after December 16, 2019.." (Supra, P.10.)   This is a Red-Herring too.

12.     United knows or should know how disingenuous this statement really is.  United settled this issue in a final and binding decision in a grievance labeled MEC 3-08.

## **Direct Evidence of Discriminatory Intent**

## **PRIOR TO AUGUST 9, 2010 AND CONTINUING**

13.     From 1988 to 1991, United selected this Flight Attendant to work the Denver Broncos football team charters. It was a privilege to be one of the few flight attendants chosen to be part of the Broncos' crew, especially considering that the Broncos played in two Super Bowls during this time.

14.     Charter Assignments The NBC charters associated with the Olympics in Beijing have drawn attention by many AFA Members with respect to the Contractual assignment of these charter flights. Earlier this year when we learned the company had successfully

secured the contract for the NBC Olympic Charters to Beijing we reminded the company of the requirements of Section 9.A.4. We made it clear our expectation was the strict adherence to these Contractual provisions and these charters would be included in lines of flying. We met with the company again in June where we learned for the first time the company did not plan to include these charters in the lines of flying. August 15, 2008.

15.   **Olympic Charter Staffing Dispute**. We are receiving some reports regarding the staffing of charter flying to Copenhagen by the City of Chicago and the U.S. Government in Washington, D.C. These charter flights currently are scheduled around the upcoming announcement of the location for the Summer 2016 Olympic Games. Attention has been drawn to the Contractual staffing assignment procedures outlined in Section 9 of our Contract, and more specifically our belief that United has not followed these procedures in past Olympic Charter assignments.

Last year, when United secured a contract for the NBC Olympic Charters to Beijing, we discussed with United the requirements of staffing for Charter flights in Section 9, and made clear our expectation that the Agreement be adhered to. We were not successful in gaining United's compliance to our Contact in this matter. As a result, we proceeded to the System Board of Adjustment where the case has been ongoing and is scheduled to resume before the arbitrator in October. The dispute regarding the manner in which United operated the NBC Olympic charters to Beijing appears to be the same as the manner in which they are operating these new charter flights.  September 25, 2009.

12.    Charter Grievance

Last year, when United secured a contract for the NBC Olympic Charters to Beijing, we discussed with United the requirements of staffing for Charter flights in Section 9, and made clear our expectation that the Agreement be adhered to. Management did not comply with our Contract in this matter when it first became an issue with the Olympic charters to Beijing. Recently this issue has arisen again with the operation of the new Olympic charters to Vancouver. The manner in which United management operated the NBC Olympic charters to Beijing appears to be the same as the manner in which they are operating the Olympic Charters to Vancouver.

   As a result of our dispute with the company over the NBC Olympic Charters to Beijing, we filed an MEC Grievance and proceeded to the System Board of Adjustment where the case was concluded in October of 2009. We are now awaiting the decision from the Arbitrator and will update you once that decision is received.  February 19, 2010.


13.    Charter Flying – **How to Become one of the "Chosen**"

   On Friday we discussed our dispute with United regarding their method of staffing charter flying. When the dispute first arose, we made clear to management our expectation that the Agreement be adhered to. Management did not comply with our Contract in this matter when it first became an issue with the Olympic charters to Beijing. Recently this issue has arisen again with the operation of the new Olympic charters to Vancouver.

Further questions have surfaced from Members as to how United picks the "chosen" ones to staff these Charters. It has come to our attention, straight from the mouth of one of our domicile managers, that these Charters are staffed with Flight Attendants chosen by our domicile managers.

To be clear, we fundamentally disagree with United and their method of tasking domicile managers with the job of finding the "chosen" ones. As a result of our dispute with management over the NBC Olympic Charters to Beijing, we filed an MEC Grievance and proceeded to the System Board of Adjustment where the case was concluded in October of 2009. We are now awaiting the decision from the Arbitrator and will update you once that decision is received.  February 23, 2010

14.   **AFA Prevails in MEC Charter Grievance MEC 03-08**

Congratulations are due to our Grievance Committee, AFA Members on the System Board of Adjustment and our AFA attorneys for the latest arbitration win on the assignment of charter flying.

In the case of MEC 3-08 (Charter Grievance), we originally filed the grievance based upon the Company's violation of section 9.A.4., 9.I., 9.F., 12.Q., and any other related Sections of the Agreement:

The Company's violation of Section 9.A.4. when they failed to place Charters(i.e., White House Press, Sports) in the Lines of Flying.

The Company's violation of Sections 9.I., 9.F. and 12.Q. when the Company failed to place the open Charter IDs in the open trip file and processed in accordance with the aforementioned Sections.

The Company's violation of Section 9.F.9. when the Company assigned "select" Flight Attendants to work open Charter assignments in violation of the Collective Bargaining Agreement.

The System Board of Adjustment's award states:

*As a remedy, we order that the Company cease and desist from "feeding" names to charters and reiterate the need for the Company to act in accordance with Section 9.A.4.*

(Emphasis Added)     **Date:** August 9, 2010

**In the 2005-2010 AGREEMENT between UNITED AIRLINES, INC. and THE FLIGHT ATTENDANTS in the service of UNITED AIRLINES, INC.**

**as represented by THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA**

THIS AGREEMENT is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, …

**TABLE OF CONTENTS**
Section Page
1 Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
4 General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .16
27 System Board of Adjustment . . . . . . . . . . . . . . . . . . . . .182

**SECTION 1**                              Section 1 Page 1
**RECOGNITION**
The Union, having been certified by the National Mediation Board, is hereby recognized by the Company as the collective bargaining representative of the

craft or class of Flight Attendants in the employ of the Company to
represent such employees and to negotiate and conclude an Agreement with
the Company covering rates of pay, rules and working conditions, in accordance
with the Railway Labor Act.

**SECTION 4**                                          Section 4 Page 16
**GENERAL**

E. Railway Labor Act                                   Section 4 Page 17

During the life of this Agreement, neither the Company, the Union, nor the
employees covered by this Agreement will cause, approve, authorize, or
support any action inconsistent with the general purposes of, and general
duties defined in the Railway Labor Act while the procedural processes
of this Agreement and the Railway Labor Act are being followed, or where
arbitration is agreed upon, or where a matter is subject to the jurisdiction
of the System Board of Adjustment.

**SECTION 27**                                         Section 27 Page 182
**SYSTEM BOARD OF ADJUSTMENT**

A.      Establishment of Board

In compliance with Section 204, Title II of the Railway Labor Act, as
amended, there is hereby established a System Board of Adjustment for
the purpose of adjusting and deciding disputes or grievances which may
arise under the terms of this Agreement and any amendments or additions
thereto, …

K. Effect of Decisions                                 Section 27 Page 185


Decisions of the Board in all cases properly referable to it shall be final and
binding upon the parties thereto.

M. Rights Under Railway Labor Act                      Section 27 Page 186

Nothing herein shall be construed to limit, restrict, or abridge the right or
privileges accorded either to the employees or to the Company, or to their
duly accredited representatives, under the provisions of the Railway Labor
Act, as amended.

## <u>After the Final and Binding Decision,</u>

## <u>United Violates it three days later on August 13, 2010.</u>

16.      We're Working Here - With a Contract

United management is determined to violate our seniority on charter assignments, and while they're at it they are trying to impose an offensive new list of qualifications on Flight Attendants seeking the charter assignments.
According to the email from United's "Charter Services Team" a football charter for the San Francisco Flight Attendants won't be bid according to seniority as required by our Contract.

No, *"the 49ers look forward to hearing from you if you are interested in this opportunity and meet the following minimum criteria:*

*Five commendations in the last two years;*

*Three or fewer points in the Attendance system;*

*No customer or company complaints in the last year;*

*No active discipline for Performance issues"*

This is clearly a management decision to circumvent our Contract. And, the ink is not even dry yet on **AFA's arbitration win** ordering the Company to stop violating our Contract by trying to hand pick Flight Attendants for charter assignments. What's next, weight checks and girdle pinching before every charter assignment!?!

We have advised the sore losers to cease and desist from violating the Contract with the San Francisco 49er charter "application process." And, we are meeting with our Legal staff now and will report more next week. **Date:** August 13, 2010

### 16.    Assignment Of Charters

In just a few weeks, United will again provide charter service to the Olympic Games for NBC. The 2014 Winter Games will be held in Sochi, Russia. We have received a number of questions from Members on how Flight Attendants are specially assigned to fly charter IDs. The following is an effort to clarify some of those questions.

Section 9.F.7.c.(9). of our Contract provides that charter flights may be specially assigned provided, 1.) the chartering company or person(s)must request a specific Flight Attendant by name and in writing and 2.)she/he shall be used subject to her/his approval.

Essentially, the charterer provides to management a list of the names of Flight Attendants they would like to work the flights. As we understand it, this list was compiled based on feedback from their employees who recommended that certain individuals be included on the charters. This is in accordance with the grievance decision in MEC 3-08 which reinforced that United management may not provide or feed names of Flight Attendants to charterers nor should they recommend specific Flight Attendants to any charterer.

In the case of the Sochi charters, management has determined they would like to have a number of Flight Attendants, based at JFK, prepared to work the charter IDs in the event a **specially assigned Flight Attendant** is unable to do so.

Management devised a process where all JFK Flight Attendants were notified via corporate e-mail and were given the opportunity to express their individual interest for any of potential, but unlikely assignments. These Flight Attendants will not be assigned to the charters unless required by an irregularity that renders any of the **specially assigned Flight Attendants** unavailable for the charter ID.  **Date:** January 14, 2014

17.     **Inflight Inflight Services Weekly**

**Major League Baseball charter opportunities beginning January 5**

Although it's still winter, United is planning for the upcoming 2022 Major League Baseball (MLB) season—and we are hopeful all our former clients will return for the upcoming MLB season.

To prepare, we will have new opportunities for flight attendants based in CLE, DEN, EWR, IAD, IAH, LAX and ORD to apply to be the Inflight Charter Coordinator (ICC) or on **the dedicated crew**. If you are not based in one of the locations mentioned above, opportunities are not available at this time.

More details on when and how to apply will be communicated in the January 5 Inflight

Services Weekly or on the Inflight Charter Program page on Flying Together. Play ball!

(Emphasis Added)  DATE: December 15, 2021

18.    United Airlines, Inc., has recently settled out of court a Complaint for Damages of

two United Flight Attendants, Kim Guillory and Sharon Tesler, after removing the case from

Superior Court of The State of California for the County of San Mateo to USDCND

California Oakland.  .  (20-CIV-03889 Complaint for Damages.)

In the Complaint for Damages:

29. This is not even the first time that flight attendants have attempted to hold United
accountable for unlawful conduct regarding the charter program. On August 2, 2010, just before the
merger with Continental was announced, United Airlines was ordered by the United
Airlines/Association of Flight Attendants System's Board of Adjustment to cease and desist from
providing or "feeding" names of select flight attendants to customers,, which it did in connection
with charter flights for White House Press and in connection with the 2008 Olympics.
 Unfortunately, this decision by the Board of Adjustment had no impact on United's conduct.
Complaint, Supra #29, P.8.

**B. THE CHARTER PROGRAM**

17. Like many airlines, United has offered a "charter" program for regular customers who
elect to hire individual planes to transport groups of individuals. Through the charter program, a
customer can hire a plane on a one-time basis (also known as "ad hoc"), or can establish an account for
regular charter transportation. Typical customers of the charter program include, but are not limited to, large
corporations desiring to transport groups of executives, and sports teams and franchises (both professional
and college teams).

18..     The charter program is an established and administered program at United, with dedicated personnel and management, including what are called "Inflight Charter Coordinators," a role performed by individual flight attendants. Flight attendants are also necessary to staff thecharter flights, to serve the customers participating in the charter program. The selection of and assignment of flight attendants to act as Inflight Charter Coordinators and to staff these charter flights should be performed in an equitable and non-discriminatory manner, in accordance with United's internal policies and California law. However, as will be seen, the reality is quite different.

I9.     Flight attendants at United are permitted to select their own flights and schedule. To do so, they access an online portal. This portal permits flight attendants to view and select upcoming flights (also known as "picking up" trips) from what is known as the "open market." All trips are supposed to be listed in the open market, and every trip is supposed to bc available for a flight attendant to pick up thc trip, Flight attendants are not permitted to "hold" flights for other flight attendants (also known as "parking trips"), yet United allows flight attendants who participate in the charter program to do so, in furtherance of the discriminatory practices alleged herein,

20.     The ability of flight attendants to view and select trips is initially based on seniority. InThe seniority integration among flight attendants from United and Continental was finalized, and seniority is now supposed to be based on the original date of hire. Thc average years of seniority of pre-merger United Airlines flight attendants is 35 years, while the average length of seniority for  pre-merger Continental Airlines flight attendants is 14 years. Once a schedule based on seniority is given, flight attendants are allowed to change their schedules by trading their trips with each other and with the open market. This process is supposed to equitably determine the ability of flight  attendants to view  and select trips and to be considered for opportunities in a non-discriminatory manner. But yet again, the reality is quite different.

2 I.     As relevant to Plaintiffs' claims, the charter programs have two groups of employees: (1) Inflight Charter Coordinators, who act as a type of concierge or coordinator with the chartercustomer; and (2) "dedicated crews," which are groups of flight attendants who are continually assigned and/or available to work a particular customer's charters for the seasonal or other duration  required.

22.     United Airlines operated its charter program for many decades. Before the merger Continental Airlines also operated its own charter program. United's program had "dedicated crew" for particular customers' charters, and a "dedicated list" to fill the dedicated crew positions and any vacancies therein, but no Inflight Charter Coordinators. Continental's program had Inflight Charter Coordinators, but no "dedicated crews" and no "dedicated lists."

23.     In 2014/2015, almost all charter flights were switched to physically operate out of Continental airplanes. As a result, for United flight attendants, Inflight Charter Coordinators, "dedicated crews were supposed to be newly selected and assigned from the entire pool of flight attendants -- but they were not. Upon the 2018 integration of flight attendants, while the positions should have been newly selected and assigned from the entire pool of both Continental and United flight attendants, they were not, even as other positions (such as for purser) were newly selected and assigned. The selection and assignment of the Inflight Charter Coordinators, "dedicated crews," and thc "dedicated list" or thc charter program was, and continues to be, unlawfully based on race and ancestry, age, and gender. These positions are not open to all flight attendants as required, but instead, are only open to those who fit a specific visual image.

24.     United currently operates approximately three dozen charters for various teams in the NFL, MLB, and NCAA. Teams are permitted to go with an "open time crew" or "dedicated crew" model. For those teams using the "open time crew" model, which means that the positions are open to any flight attendant to obtain through thc open market, the flight crews demonstrate higher diversity among age, race, and gender. However, the "open time crew" model is rare, because  instead, United encourages the majority of its customers to elect to hire a "dedicated crew" of flight attendants. For many of the charter customers — including, but not limited to, the San Francisco 49ers, the Los Angeles Rams, the Kansas City Chiefs, and the New Orleans Saints — their "dedicated  Crews" have been young, white, female, and predominately blond/blue-eyed for years.

25.     Flight attendants who are assigned to work on charter flights as Inflight Charter Coordinators, "dedicated crew," or even on an ad hoc (one off) basis, receive many benefits which are not available to other flight attendants, including but not limited to higher wages, premium hotel accommodations, and more. Although United has a prohibition of accepting gifts over $25, the flight attendants working as dedicated crew also receive tickets to and the ability to attend games and playoff

games including the Super Bowl, extremely valuable passes granting field access (which are not even available to the general public), merchandise, and more.

(Complaint, Supra P5,6.)

### D. THE LONG HISTORY OF DISCRIMINATION AT UNITED

26.     United has a long history of discriminatory employment practices, and the company has been subject to dozens of lawsuits filed by flight attendants, pilots, and others in various state, federal, and administrative tribunals around the country. Rather than focus on the quality of work and the loyally shown by its employees, United has inappropriately elected to value them based on 18 their age, race, and gender, mid the company has engaged in repeated efforts to sexualize Professional flight attendants for its own economic gain.

27.     Though the airline first hired female flight attendants in the 1930s, until the late 1960s, it required them to take an oath that they would not many or have children. The "marriage ban" was not officially overturned until a series of EEOC and court decision in the late 1960s and early 1970s.

The pregnancy ban, and the company's failure to offer maternity leave, extended into the 1970s, (despite the Pregnancy Discrimination Act in 1978) and United States Supreme Court review.

In March 1966, United even enacted an "age ceiling" of 32 years of age, which was also eventually struck down. These discriminatory practices were supported by strict policies regarding the weight, appearance, and grooming of flight attendants, all of which were written so as to encourage the hiring and retention of young, white, female employees.

28.     By statute and as a result of decades of jurisprudence, United is prohibited from using age, race, and gender to make employment decisions. It is prohibited from using age, race, and gender to offer special assignments, promotions, training, and workplace benefits. The unlawful use 6 ot these factors to determine the Inflight Charter Coordinators and the flight attendants serving charter flights is merely the latest in United's unceasing and recidivist efforts to lure its customers with the sexualized image of young, white, female flight attendants.

## IV. <u>THE APPLICABLE LEGAL STANDARDS UNDER THE RAILWAY LABOR ACT</u>

19.     In the Railway Labor Act and the National Mediation Board's August 1940

Report: "Theoretically all disputes are settled by collective agreement, but of course many

differences of opinion arise as to the meaning and application of agreements.   But the

National  Railroad Adjustment Board, or adjustment boards created in lieu thereof by

agreement of the parties, provide industrial court for adjudicating these differences, just as

the civil courts adjudicate  differences with respect business contracts.  The collective

agreements are in effect industrial constitutions and laws adopted by the carriers and their

employees for the government of their joint relations and the adjustment boards are the

courts that interpret these laws. At Page 43.

20.     In *Elmore v. Chicago & Illinois Midland Railway Co*, the Seventh Circuit stated: Private

arbitration, however, really is private; and since constitutional rights are in general rights against

government officials and agencies rather than against private individuals and organizations, the fact that a

private arbitrator denies the procedural safeguards that are encompassed by the term "due process of law"

cannot give rise to a constitutional complaint. **The National Railroad Adjustment Board, however, while**

**private in fact, is public in name and function; it is the tribunal that Congress has established to**

**resolve certain disputes in the railroad industry. Its decisions therefore are acts of government, and**

**must not deprive anyone of life, liberty, or property without due process of law**.  64  64. Elmore v. Chi.

& Ill. Midland Ry. Co., 782 F.2d 94, 95-96 (7th Cir. 1986) (emphasis added) (citations omitted)

Transportation Law Journal Vol 38:63 at 73.

21.    In *Miller v. United Airlines, Inc.*, "The Railway Labor Act, 45 United States Code section 151 et

seq., governs the employment relationship between airlines engaged in interstate commerce and their

employees. fn. 1.  (See *Miller v. United Airlines, Inc.*, 174 Cal. App. 3d 881 (1985)

45 United States Code section 151a itself defines some of the purposes of the RLA: "(4) to

provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working

conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or

out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." In

order to implement these purposes, railroads and airlines have a duty "to make and maintain agreements

concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the

application of such agreements or otherwise." (45 U.S.C. § 152.)  Employers also have an obligation to

establish a grievance procedure which employers and their employees must follow in resolving employment

disputes. Section 153 requires that disputes between railroads and their employees be submitted to the

National Railroad Adjustment Board or to a system, group, or regional board. Section 184 provides that

disputes between employees and airlines "shall be handled in the usual manner up to and including the chief

operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this

manner, the disputes may be referred by petition of the parties or by **[174 Cal. App. 3d 885]** either party to

an appropriate adjustment board."

"Courts apply the RLA to railroad and airline adjustment boards in the same manner, even

though different provisions of the RLA govern each industry. (See, e.g.,Machinists v. Central Airlines

(1963) 372 U.S. 682 [10 L. Ed. 2d 67, 83 S. Ct. 956]; Bernhardt v. American Airlines, Inc. (9th Cir. 1975)

511 F.2d 1219, 1220, fn. 1.)

[2] It has been held that the provisions of the collective bargaining agreements negotiated between employers and their employee unions under the RLA are made pursuant to federal law. (Railway Employes' Dept. v. Hanson (1956) 351 U.S. 225, 232 [100 L. Ed. 1112, 1130-1131, 76 S. Ct. 714].) [3] The Supreme Court has also held that in some situations the RLA establishes the exclusive mechanism for addressing and resolving the grievances of airline and railroad employees over issues related to their employment. *Miller*, Supra.

In Gunther v. San Diego & A. E. R. Co. (1965) 382 U.S. 257 [15 L. Ed. 2d 308, 86 S. Ct. 368], the court addressed the issue of a federal court's rejection of the Railway Adjustment Board's interpretation of a collective bargaining agreement. The court reviewed prior authority applicable to the RLA, observing that: "This Court time and again has emphasized and re-emphasized that Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board. In Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, the Court gave a Board decision the same finality that a decision of arbitrators would have. In Union Pacific R. Co. v. Price, 360 U.S. 601, the Court discussed the legislative history of the Act at length and pointed out that it 'was designed for effective and final decision of grievances which arise daily' and that its 'statutory scheme cannot realistically be squared with the contention that Congress did not purpose to foreclose litigation in the courts over grievances submitted to and disposed of by the Board ....' 360 U.S., at 616.

In a case similar to the instant one, a railroad employee filed an action in state court based on state law for breach of contract. (Andrews, supra, 406 U.S. 320.) The suit was dismissed on the ground that the employee failed to Exhaust his administrative remedies pursuant to the RLA. **The Supreme Court affirmed after examining the issue of whether the right asserted by the employee had its source in the collective bargaining agreement. The court stated that "the notion that the grievance and arbitration**

procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the

employee or the carrier chooses, was never good history and is no longer good law." (Id, at p. 322 [32

L.Ed.2d at p. 98].) The court also observed that the administrative remedy outlined in the RLA is not

derived from any contractual relationship between the parties, but from the RLA itself. (Id, at p. 323

[32 L.Ed.2d at pp. 98-99].)  (Emphasis  Added) *Miller*, Supra at 886.

22.      **"We hold that Board proceedings are subject to basic Fifth Amendment

         requirements that the proceedings are fair."** (Emphasis Added)  Quoted in

         *English v. Burlington Northern Railroad Company*, 18 F.3d 741 (Ninth Circuit,

         1994)

23.    In 1934, the Fourth Circuit Court of Appeals, quoting the Supreme Court , found

that "The Right of self organization and representation in the matter of rates of pay, hours of

labor, and working conditions is a property right, the loss of which would result in

irreparable damage to claimants. " *Virginia Railway Co.v System Fed'n No 40,* 84 F.2d 641

(1936) 4th Cir., affirmed 300 U.S. 515 (1937) quoting:

> *Texas & N.O.R. Co. v. Brotherhood of RY. & S.S. Clerks*, 281 U.S. 548, 50 S. Ct.
>
> 427 (1930) Airline employees have property rights under the RLA. *Virginia*,
>
> Supra.  *IAM v Street*, 367 U.S. 740 (1961).  An employee's "job rights" (i.e.,
>
> seniority and contractual rights) are their property rights. Once an employee has
>
> property rights, they cannot be taken away without due process. *Hill v Norfolk and*
>
> *Western Railway*, 814 F.2d 1192 (7th Cir. 1987).

24.    United and the Union has petitioned the Adjustment Board under the federal Railway Labor Act to resolve the dispute of the Charter Seniority and the Adjustment Board has formulated a decision that is final and binding on both sides.  45 U.S.C. § 153, (m) and 45 U.S.C. § 184.  The Railway Labor Act created what is in effect an administrative industrial court for the adjudication of disputes involving the interpretation or application of wage and rules and working collective agreements of rail and air carriers.

In *International Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 689-90 (1963), the Court said: In view of the clearly stated purposes of the Act and of its history, reflecting as it does a steady congressional intent to move toward a reliable and effective system for the settlement of grievances, we believe Congress intended no hiatus in the statutory scheme when it postponed the establishment of a National Air Transport Adjustment Board and instead provided for compulsory system, group, or regional 'boards. Although the system boards were expected to be temporary arrangements, **we cannot believe that Congress intended an interim period of confusion and chaos or meant to leave the establishment of the Boards to the whim of the parties. Indeed, it intended the statutory command to be legally enforceable in the courts and the boards to be organized and operated consistent with the purposes of the Act.** (Emphasis Addd)

In 1936, Congress extended the Railway Labor Act to cover the then small-but-growing air transportation industry. 49 Stat. 1189, 45 U.S.C. § 181-188. Its general aim was to extend to air carriers and their employees the same benefits and obligations available and applicable in the railroad industry.3

3 See Hearings on S. 2496 before a Subcommittee of the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess. 26-27. (*Central,* Supra at 685, 686.

The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanction: "[T]he federal statute is the source of the power and authority . . .

The enactment of the federal statute . . . is the governmental action . . . though it takes a private agreement to invoke the federal sanction. . . . A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it . . . ." *Railway Dept.* v.*Hanson*, 351 U.S. 225, 232. **That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts.**  (Emphasis Added) (*Central,* Supra at 692).

## V.  <u>MS. SCHENCK WOULD  FILE A SECOND AMENDED COMPLAINT</u>

Upon the Court's own motion, or with this Court's permission, Ms. Schenck would file a second amended complaint to include a Cease and Desist Order and the Enforcement of the August 9, 2010 MEC 3-08 System Board Decision by this Court.

## VI. <u>DUE PROCESS</u>

If this case is remanded, in part, back, to System Board, with this Court maintaining jurisdiction, Ms. Schenck will be requesting her due process. The previous facts are United denied a flight attendant his due process.  This flight Attendant was told in his letter from a United lawyer that Due Process doesn't exist under the RLA. United has reaffirmed his right to be at a System Board individually without the Union.  But **<u>United has established the Grievance process under a protocol with the Union for the unrepresented flight attendant</u>** that going forward on his own the Flight Attendant to **<u>pay a unspecified sum of money</u>** to have a System Board, entitled to **<u>no discovery</u>**, like his individual Terms and Conditions of Employment Contract **, <u>no access</u>** to previous System Board Decisions or contracts, **<u>no witnesses</u>** and will be **<u>going forward without any Union assistance</u>** in arbitration, even if none of these issues are spelled out in the United CBA or Side Letters.  The Flight Attendant was **<u>not permitted</u>** to join United in the choice of the arbitrator.  The Flight Attendant was **<u>not permitted</u>** to have a partisan member on the Board representing his interests.  The Flight Attendant was **<u>not permitte</u>**d to have a partisan board member to assist the Chairman under a previous protocol between United and the Union for

unrepresented flight attendants. **This Flight Attendant was denied his due process before the hearing and during the hearing.**

25.    The Supreme Court has held that the Railway Labor Act grants to the employee the right to participate at every stage of the grievance adjustment process and to process his grievance independently of his union. (*Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711. 1944.)

"One important difference preserved the aggrieved employee's rights to participate in all stages of the settlement. Congress therefore, when it preserved those rights, contemplated something more than collective representation and action to make the settlement effective for the past. It follows that the individual employee's rights cannot be nullified merely by agreement between the carrier and the union. They are statutory rights, which he may exercise independently or authorize the union to exercise in his behalf 733-36 (1945). These rights are statutory and may not be abrogated by agreement between the employer and the union." *Id.* at 740 n.39.

### VII. <u>Prior Courts holds Arbitration Agreement Requiring Employee to Pay Half of Arbitration Costs is Unconscionable.</u>

26.    In *Chavarria v. Ralphs Grocery Co.*, No. 11-56673, 2013 WL 5779332 (9th Cir. Oct. 28, 2013), the plaintiff, a former deli clerk, brought a class action against Ralphs for various alleged wage and hour violations of the California Labor Code. As a condition of employment, Chavarria signed an arbitration agreement containing a class action waiver. Ralphs filed a motion to compel arbitration.

The U.S. Court of Appeals for the Ninth Circuit affirmed the district court's ruling that Ralphs' arbitration agreement was unconscionable and therefore unenforceable. The Court said the agreement was procedurally unconscionable because it was "presented on a 'take it or leave it' basis with no opportunity for Chavarria to negotiate its terms."

Regarding substantive unconscionability, the Court found that Ralphs' arbitrator selection provision would always result in Ralphs' choosing the arbitrator whenever an employee initiated the arbitration and also explicitly precluded the use of institutional arbitration administrators, AAA or JAMS. The Court also found that the agreement's requirement that the arbitrator apportion his or her fees evenly between Ralphs and the employee unless and until the U.S. Supreme Court ordered otherwise was directly contrary to California state law requiring that employers bear the costs of arbitration. Despite the Supreme Court's recent pronouncement favoring the enforceability of arbitration agreements, the Court found that *American Express Corp. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013), did not preclude it from considering the cost the arbitration agreement imposed on employees in order for them to bring a claim. In this case, the failure to shift the arbitration costs to the employer presented a potentially prohibitive obstacle to having the claim heard. (Jdsupra.com)

**27.** "On November 22, 2019, the United States Court of Appeals for the Eleventh Circuit, the court with jurisdiction over Alabama, Florida, and Georgia, handed down a decision that invalidates certain provisions in arbitration agreements in Fair Labor Standards Act (FLSA) wage and hour cases. *Hudson v. P.I.P. Inc.*, Case No. 19-11004, has significant impact for any employer in Alabama, Florida, or Georgia that uses arbitration agreements with its employees.

In *Hudson,* the court addressed an arbitration agreement that contained a commonplace provision requiring the employee to pay half of the arbitration costs." National Law Review, Volume XII, Number 40, February 9, 2022.

## VIII.  **TAKE IT OR LEAVE IT**

The United attorney and Union presented Ms. Schenck  the same take it or leave it

offer when they refused to reinstate her timely filed grievance.

## IX.  **CONCLUSION**

For the reasons set forth above, Plaintiff Michelle Schenck asks this court to deny

Defendant's Motion to Dismiss..


By ~~Michelle Schenck~~
Michelle Schenck, Pro Se


## **CERTIFICATE OF SERVICE**

I hereby certify that I caused Plaintiff's Memorandum to be served a true copy of the

foregoing through the United States Postal Service Priority Mail to:

Pamala Reynolds
Littler Mendelson, PC
375 WoodCliff Drive Suite D
Fairport, N.Y. 14450

~~Michelle Schenck~~
Michelle Schenck